Shirley HIGGINS, Appellee,

v.

BLUE CROSS OF WESTERN IOWA AND SOUTH DAKOTA and Blue Shield of Iowa, Appellants.

No. 66272.

Supreme Court of Iowa.

May 19, 1982.

Rehearing Denied July 15, 1982.

Dewie J. Gaul of Jacobs, Gaul, Nymann & Green, Sioux City, and L. Call Dickinson, Jr., and Craig F. Graziano of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellants.

J. Michael Dull and Robert J. Dull of Dull Law Firm, LeMars, for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McCORMICK, ALLBEE, and McGIVERIN, JJ.

ALLBEE, Justice.

This lawsuit arises from defendants' rescission of plaintiff's insurance contract for hospital and medical services. A jury awarded plaintiff actual damages of $27,143.90 on her contract claim and punitive damages of $200,000 on the theory that defendants committed a tort by denying contract benefits in bad faith. Defendants challenge both awards on this appeal, and we reverse.

The following facts are largely undisputed. In January 1978, plaintiff completed an application form for Blue Cross/Blue Shield coverage. The form contained an inquiry as to whether plaintiff had any "eye or ear abnormality or disease," which plaintiff answered "no." The form also asked if plaintiff had "had any medical advice or treatment or departure from good health not mentioned above." Here, plaintiff noted only that she had had surgery for diverticulum, a problem involving her urinary tract. Next on the form appeared a statement whereby the applicant certified "that the information, statements and answers as herein recorded are full, true and correct to the best of my knowledge and belief, and that no information required to be given therein, either expressly or by implication, has been knowingly withheld." It was further declared that untrue statements or omissions of requested information would bar all rights to recovery and would make the contract subject to cancellation from its effective date. After plaintiff completed and signed the application, it was submitted to defendants. Subject to a rider excluding diverticulum, a contract was issued effective February 1, 1978. Plaintiff then cancelled her previous health care coverage.

Several months later, plaintiff was examined by Dr. Daryl Doorenbos, who advised her that her blood pressure was elevated and referred her to Dr. Walter Eckman for further examination. On Dr. Eckman's advice, plaintiff was admitted to a hospital for tests on October 4, 1978. A claim with regard to that hospitalization was submitted to defendant Blue Cross. In connection with that claim, Blue Cross received certain hospital records, including a patient history which stated in part: "Basically over the past few years she's had a number of transient ischemic episodes affecting the left eye and also a few recently affecting the right side of her body, also affecting her speech in the past year." This history had been dictated by Dr. Eckman upon plaintiff's admission to the hospital.

Trial testimony established that ischemic episodes may consist of brief periods of fading vision, dizziness or numbness, brought on by a vascular disorder which results in an inadequate blood supply to the brain. Due to the severe complications, including stroke, to which ischemic episodes can lead, defendants have an underwriting guideline that coverage should not be extended to persons who have had such episodes. There was uncontradicted testimony that no contract would have been issued to plaintiff if her application had mentioned the problems reported in Dr. Eckman's history. Because her application did not refer to those episodes, Blue Cross determined that there was a potential underwriting problem with regard to plaintiff's claim and that further investigation was in order.

A letter, which incorrectly stated that plaintiff wished to "obtain" Blue Cross coverage, was initially sent to Dr. Doorenbos on November 8. It requested, inter alia, details of "ischemia of the eye or any other part of the body over the past 10 years with any residuals." Dr. Doorenbos's response to that particular inquiry was: "Refer to Dr. Eckman." A similar letter was therefore sent to Dr. Eckman on November 14. Dr. Eckman's response, dated January 12, 1979, stated in pertinent part: "According to her history she has had episodes of partial blindness, recurring episodes of slight dizziness and some difficulty with speech. She has had brief episodes of visual disturbances going back over ten years."

After receiving Dr. Eckman's response, Blue Cross concluded, with the advice of counsel, that plaintiff's contract should be rescinded because of failure to disclose on her application the apparently longstanding visual problems she had subsequently reported to Dr. Eckman. By letter dated February 7, Blue Cross refunded all premiums paid by plaintiff and informed her that her membership was being voided and that no claim liability would be assumed. Plaintiff had not been previously notified that her claim was being investigated.

A series of correspondence ensued between Blue Cross and plaintiff's attorney, during the course of which the attorney was advised that Blue Cross "would be glad to review any new information you have which is different than that on which we made our determination." Plaintiff's attorney forwarded to Blue Cross the following:

(1) A letter from Dr. H. L. Vander Stoep, plaintiff's family doctor through April 1977, stating that plaintiff had been treated in March 1977 for diverticulum of the urethra; that there were "no complications and no problems related to her vascular system"; that there was "nothing in her medical records" to confirm a "pre-existing condition"; and that "everyone in her age group has a varying degree of atherosclerosis."

(2) A letter from Dr. Dwayne E. Howard, a urologist, stating that his records on plaintiff showed no history of hypertension and that her blood pressure was not, in his opinion, significantly high at the time she was examined in 1977.

(3) A letter from Dr. Doorenbos containing a statement that when plaintiff was seen in 1977 for a bladder problem, "no indication of hypertension or vascular disease was discussed, nor was it apparent," and that there was no indication in his records that plaintiff was aware of a hypertension problem prior to September 1978.

Blue Cross responded to plaintiff's attorney, indicating that the company did not believe the doctors' letters had contradicted the information upon which the decision to rescind had been based and that the company would not change its position unless Dr. Eckman furnished "supported" information different from that contained in his record.

On April 19, 1979, plaintiff filed this suit, alleging that defendants had willfully and knowingly "repudiated" her insurance contract, and in doing so had acted "maliciously and with wanton disregard" for plaintiff's rights.

One day after the lawsuit was filed, Dr. Eckman wrote a letter to defendant Blue Shield. He noted that two years previously, plaintiff had had a problem with the vision in her left eye while she was in Colorado, and that a doctor who saw her

there told her she might have a local problem in the eye. That doctor, he said, had advised plaintiff to have check-ups for glaucoma, but had not mentioned any possibility of cerebrovascular disease or suggested further evaluation. Dr. Eckman's letter further stated his opinions that plaintiff "was not aware of her problem or of its significance as of January 1978" and that defendants had "made a very poor decision" in rescinding plaintiff's contract. Enclosed with the letter was an outpatient report, partially set out in the margin,[1] which he had dictated on September 28, 1978. Blue Cross reviewed this letter and report with a view toward reconsidering its decision, but declined to change its position because the company concluded that the outpatient report reinforced the original decision.[2]

## I. *Punitive damages.*

■ Punitive damages may not be recovered for a mere breach of contract; it is only when the breach also constitutes an independent tort, or other illegal or wrongful act, that punitive damages become a possibility. *Pogge v. Fullerton Lumber Co.,*

277 N.W.2d 916, 920 (Iowa 1979). Accordingly, defendants' first contention on appeal is that there was insufficient evidence of any tort for the punitive damage issue to be submitted to the jury. Defendants preserved error on this issue by way of motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial.

■ We have recognized two torts which may be proved in connection with the breach of an insurance contract. The first, not applicable here, involves breach of a liability insurer's duty to act in good faith in representing an insured against a third party claim. *Kooyman v. Farm Bureau Mutual Insurance Co.,* 315 N.W.2d 30, 33–34 (Iowa 1982); *Koppie v. Allied Mutual Insurance Co.,* 210 N.W.2d 844, 846–48 (Iowa 1973).[3] The second is the tort of intentional infliction of emotional distress, which may arise from an insurer's conduct in handling the claim of an insured. *Amsden v. Grinnell Mutual Reinsurance Co.,* 203 N.W.2d 252, 253–55 (Iowa 1972). In the present case, trial court ruled that there was insufficient evidence of emotional distress and

**1.** The September 28, 1978, outpatient report stated in relevant part:

Her chief problems have been episodes of partial blindness of the left eye, recurring episodes of slight dizziness and some difficulty with speech. She remembers going back ten years having brief episodes of flashing lights, affecting the peripheral visual fields in the left eye. Two years ago she remembers very distinctly sitting at the dinner table and suddenly was unable to see out of her left eye ("just like a curtain coming over the eye"). This lasted for only a few seconds and then disappeared having cleared completely. She saw Dr. Belke in Ft. Collins, Colorado and he found no significant abnormality on examination and advised her to have checkups for glaucoma. Since that time she has continued to have occasional episodes of partial blindness in the left eye, developing a grayish cast in her vision, continuing to lose acuity briefly and occasionally associated with brief periods of lightheadedness or dizziness. She has had some aggravation of these spells, that is precipitation of the spells, by changing the position of her head particularly with looking up, has also had some aggravation of these problems by bright sunlight. She has had no associated headache, no particular warning that these spells were about to come on.

She also remembers about nine months ago while at work she was attempting to give directions to a woman and suddenly was totally unable to speak. She states that this was present for about one minute; she thought her throat was very dry and then as she began to recover her speech was very choppy, making some incorrect word choices. She had no headache. She has had no spells of blackout or loss of consciousness. She had no particular dizziness or lightheadedness with this problem and after a few minutes the deficit cleared completely and she had no residual speech difficulty. Several weeks later she remembers again developing dizziness and lightheadedness which lasted only briefly. She had no associated speech difficulty.

**2.** A Blue Cross official testified at trial that the company frequently receives letters from attending physicians which contain statements at variance with their own previously completed medical records.

**3.** In *Long v. McAllister,* 319 N.W.2d 256, 262 (Iowa 1982), filed separately this date, we refused to recognize a cause of action which would permit a third party to recover against an insurer for bad faith in failing to settle a liability claim against the insured.

withdrew that issue from the jury's consideration. Plaintiff does not challenge that ruling.

The tort theory under which trial court did submit the issue of punitive damages to the jury was that of an insurer's bad faith refusal to pay a valid first-party claim. This tort has not been recognized in Iowa, although it was discussed recently in *M–Z Enterprises v. Hawkeye-Security Insurance Co.*, 318 N.W.2d 408, 414 (Iowa 1982). The opinion in that case noted that other jurisdictions are divided on the question of whether such a tort should be recognized. This court, however, found it unnecessary to decide that question:

> The facts in this case do not require us to adopt or reject the tort of bad faith in the first-party situations. The decisions recognizing the tort generally hold that plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the insurer's knowledge or reckless disregard of the lack of reasonable basis for denying the claim. *See, e.g., Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 691–92, 271 N.W.2d 368, 376 (1978). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. *Id.* at 691–93, 271 N.W.2d at 376–77. In this litigation [the insurer's defense to the contract claim] and supporting evidence clearly made [the insured's] claim "fairly debatable," as trial court must have determined when it submitted the issue to the jury. This being so, there was no bad faith issue in the case, and, as a matter of law, that claim should not have been submitted to the jury.

*Id.* at 415.

■■ The approach taken in *M–Z Enterprises* is likewise warranted under the facts of this case; we find it unnecessary to decide here whether the bad faith tort should be recognized in first-party cases in Iowa. The evidence adduced by defendants in support of their defense of misrepresentation clearly made plaintiff's contract claim "fairly debatable," and trial court must have determined this was so when it denied plaintiff's motion for a directed verdict on that claim. Plaintiff thus failed as a matter of law to prove what the adopting jurisdictions consider an essential element of the first-party bad faith tort, i.e., the absence of a reasonable basis for denying contract benefits.[4] Accordingly, the jury should not have been instructed on that tort, and plaintiff's claim for punitive damages should not have been submitted to the jury. We therefore reverse the punitive damage award and remand for entry of judgment in defendants' favor on the punitive damage claim.

## II. *Actual damages.*

As noted at the outset of this opinion, in addition to punitive damages the jury awarded plaintiff $27,143.90 in actual damages on her breach of contract claim. Defendants argue that this portion of the judgment should also be reversed and the contract claim remanded for a new trial because of alleged errors committed by trial court in instructing the jury and in admitting certain evidence.

### A. *The instruction on misrepresentation.*

■ As a defense to plaintiff's contract claim, defendants asserted that plaintiff's application for health care coverage contained misrepresentations and knowing omissions of material fact. Whether defendants had proved that defense was the primary question to be decided by the jury, as defendants did not otherwise contend that the contract failed to cover plaintiff's claim.

In instructing the jury on that defense, trial court listed the particulars in which defendants claimed that plaintiff had failed to fully and truthfully answer the questions

---

**4.** As to plaintiff's contention that defendants failed to conduct a reasonable investigation of her claim, we find the evidence on that point insufficient to generate a jury question on the issue of bad faith. For a factually similar case in which the same conclusion was reached, *see Findley v. Time Insurance Co.*, 264 Ark. 647, 651–55, 573 S.W.2d 908, 910–12 (1978).

on the application form. It then instructed the jury on the applicable law as follows:

In order for defendants to prevail in their affirmative defense of material misrepresentation, the burden is upon them to establish by a preponderance of the clear, convincing and satisfactory evidence that Mrs. Higgins made a representation in connection with her application for insurance; that such representation was false; that such representation was material to the transaction (that is, that such representation materially affected the risk assumed by Blue Cross and Blue Shield); that such representation was made by Mrs. Higgins with actual knowledge of falsity or reckless disregard of whether such representation was true or false; that Mrs. Higgins intended to deceive Blue Cross and Blue Shield; that defendants relied on the representation in issuing their health care contract to Mrs. Higgins; and that Blue Cross and Blue Shield would not have issued a health care contract to Mrs. Higgins if the true facts had been known.

Defendants objected to this instruction on the ground that it failed to inform the jury that omission of a material fact can be equivalent to an affirmative misrepresentation. *See Lockard v. Carson*, 287 N.W.2d 871, 876–77 (Iowa 1980); *Loghry v. Capel*, 257 Iowa 285, 288–92, 132 N.W.2d 417, 419–21 (1965). Trial court refused to amend the instruction, and defendants contend this was error.

Plaintiff argues that by including defendants' assertions of nondisclosure in the instruction, trial court adequately provided the jury with a proper understanding of the issue it had to decide. We cannot agree. The crux of the instruction is the portion set forth above; there, the jury is told what it *must* find in order for defendants to prevail on their affirmative defense. Because that statement contains no reference to nondisclosure, a jury could erroneously conclude that the law requires proof of an affirmative falsehood. Under such a misapprehension, a jury could feel constrained to find for the plaintiff even if it agreed with defendants' assertion that she had knowingly withheld material information. We conclude that trial court's failure to instruct the jury on the legal effect of a material nondisclosure was prejudicial error and that defendants are entitled to a new trial on the issue of their contract liability.

Because other issues raised by defendants are likely to recur on remand, we will address them briefly.

### B. *The marshaling instruction.*

Instruction No. 9 included the following:

In order for plaintiff to recover upon her claim against defendants, the burden of proof is upon her to prove by a preponderance of the evidence that there was a health care contract in existence under which plaintiff was entitled to benefits from defendants for hospital and medical services; that plaintiff suffered an illness and received hospital and medical services for which benefits were payable by defendants; and that defendants failed to pay such benefits and the amount thereof.

*If plaintiff has proved each element of her claim as described in this instruction, then your verdict upon plaintiff's claim for actual damages will be for plaintiff and against defendants.* If, however, plaintiff has failed to prove her claim for actual damages or if defendants have proved their affirmative defense of material misrepresentations by plaintiff, then your verdict on plaintiff's claim for actual damages will be for defendants and against plaintiff.

(Emphasis added.)

Defendants objected at trial to the sentence emphasized above. They contended that this sentence should read: "If plaintiff has proved each element of her claim as described in this instruction, *and if defendant has not proved its affirmative defense,* then your verdict upon plaintiff's claim for actual damages will be for plaintiff and against defendants." (Emphasis added.) Although they recognized that the affirmative defense was mentioned in the next sentence, defendants expressed concern that a jury might "hitch onto" the first

sentence and award actual damages without regard to whether the affirmative defense had been established. Trial court declined to revise the instruction, and defendants assert this was error.

The two sentences in the last paragraph of instruction 9 may be inconsistent. The first appears to tell the jury that it may find for the plaintiff without regard to whether defendants have established their affirmative defense. The second tells the jury that it may not find for the plaintiff if defendants have established that defense. *Cf. Childers v. McGee*, 306 N.W.2d 778, 780 (Iowa 1981). "When a court gives inconsistent instructions and the jury returns only a general verdict, it is impossible to tell which instruction the jury followed," and a reversal may be required. *Id.* In the present case, however, the proximity of the two sentences within a single instruction makes the question of inconsistency a close one. The second sentence could be viewed as supplementing the first.

We need not decide whether we would predicate a reversal on this assignment of error; we will, however, state that the instruction would have been clearer and more accurate if defendants' suggestion had been incorporated. In view of the closeness of the question, we suggest that trial court revise the instruction upon remand if so requested.

C. *The evidentiary question.*

As mentioned earlier, Dr. Eckman wrote a letter to defendant Blue Shield one day after plaintiff filed this lawsuit. In it he described what a Colorado doctor had previously told plaintiff; he also stated his opinions that plaintiff "was not aware of her problem or of its significance as of January 1978" and that defendants had "made a very poor decision" in rescinding plaintiff's contract. Before trial, defendants moved in limine to prevent plaintiff from introducing the letter, arguing that it contained hearsay statements as well as opinions which were not the proper subject of opinion evidence or which were based on hearsay. Trial court overruled the motion on the ground that the letter was not hearsay because it was not being offered to prove the truth of the matters asserted therein. The court made no specific response to defendants' objections regarding impermissible opinion evidence. At trial, the court overruled defendants' objections to admission of the letter and told the jury that it was to consider the letter for the limited purpose "of showing what these parties were saying to each other at the times in question and not for the purpose of showing that what they said was necessarily true." On appeal, defendants challenge the overruling of their opinion objections.

■ Dr. Eckman's "very poor decision" comment, in effect, constituted an opinion on the validity of defendants' misrepresentation defense. Ordinarily, such a statement would be inadmissible at trial because it is an opinion on a mixed question of law and fact and therefore is not a proper subject of opinion evidence. *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 361, 5 N.W.2d 646, 663 (1942); *Schlichte v. Franklin Troy Trucks*, 265 N.W.2d 725, 730 (Iowa 1978); *State v. Johnson*, 224 N.W.2d 617, 622 (Iowa 1974); McCormick, *Opinion Evidence in Iowa*, 19 Drake L.Rev. 245, 259, 263, 272 (1970); *see also Kooyman v. Farm Bureau Mutual Insurance Co.*, 315 N.W.2d 30, 37 (Iowa 1982) (expert opinions that liability insurer's attorneys acted in bad faith and that insurer failed to conduct a sufficient investigation of a claim against the insured were inadmissible).

■ The other opinion in Dr. Eckman's letter, concerning plaintiff's state of mind in January 1978, would ordinarily be inadmissible because it was not based on any special training, experience or knowledge with respect to the issue in question and therefore would not aid the jury. *See Greenwell v. Meredith Corp.*, 189 N.W.2d 901, 908 (Iowa 1971); *McKeever v. Batcheler*, 219 Iowa 93, 97–98, 257 N.W. 567, 569 (1934). Furthermore, as Dr. Eckman did not know plaintiff in January 1978, his opinion was based solely on hearsay and thus lacked a proper foundation. *See, e.g., Ruby v. Easton*, 207 N.W.2d 10, 20 (Iowa 1973).

Arguably, the situation in each case may be different when the opinion appeared in a

letter previously sent to an insurer who is being sued for bad faith denial of contract benefits, and the insurer's awareness of that opinion is relevant to that insurer's state of mind regarding the existence of a reasonable basis for denying the claim. We need not decide that question, however, nor need we determine whether it matters that the letter in this case was not written until after the lawsuit had commenced. The sole claim to be tried on remand is the contract claim. Defendants' state of mind will not be an issue in that trial.[5] If the opinions in Dr. Eckman's letter are again offered and objected to on the same grounds, trial court should sustain the objections for the reasons stated in the above-cited authorities.

### III. Conclusion.

We reverse trial court's judgment and remand for: (1) entry of judgment in defendants' favor on the punitive damage claim, and (2) a new trial limited to the claim for contract damages.

REVERSED AND REMANDED.

---

5. This fact may also have a bearing on whether there will be any valid nonhearsay use upon retrial for the statements in Dr. Eckman's letter which were objected to as hearsay.